**STANDARD SHIPBUILDING COR- PORATION**

**v.**

**The UNITED STATES.**

**No. 50250.**

United States Court of Claims.

Dec. 6, 1955.

G. William Shea, Los Angeles, Cal., for plaintiff. Harold A. Black, Los Angeles, Cal., and William S. Lee, Costa Mesa, Cal., were on the briefs.

Bruce G. Sundlun, with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

Plaintiff seeks to recover monies which it alleges are due under certain contracts with the defendant. The parties have stipulated that defendant owes plaintiff $43,181.13 and that plaintiff owes defendant $8,497.76 under these contracts. The agreed net indebtedness in favor of the plaintiff therefore amounts to $34,683.37. Against this amount the defendant pleads a counterclaim which, if sustained, has been stipulated to be $109,128.70. In this counterclaim defendant seeks to recover certain dividends which plaintiff received under a workmen's compensation insurance policy and which defendant alleges were paid to plaintiff after defendant had reimbursed plaintiff for the amount of the original premiums.

Plaintiff is a California corporation, sometimes engaged in the ship repair business, which, on or about September 15, 1943, entered into three master ship repair contracts with different agencies of the defendant. These contracts were War Department No. W30–179tc–188, Navy Department No. NOBS–10185, and War Shipping Administration No. WSA–6045. The stipulated indebtedness of $34,683.37 arises out of the Navy and War Shipping Administration contracts only. Except for the different Government agencies, each of these contracts contains the same original provisions and the same amendments. Certain detailed provisions of the common contract are quoted in the findings of fact. In general outline the contract provided as follows:

The contractor undertook to make repairs and alterations on vessels ordered to its plant for this purpose. Article 5 of the contract (together with minor provisions of other articles) set forth how plaintiff was to be compensated. Plaintiff was to receive a specified amount for each hour of "Payable Hours of Direct Labor." The contract defined the latter term as the sum of the quotients obtained by dividing the total wages of workmen performing direct labor on the work by their respective wage rates. The amount which the original contract specified for each hour of payable hours of direct labor was revised from time to time by supplemental agreements negotiated between the parties. Section (d) of Article 5 provided for further negotiation of this amount at the instance of either party after the quarterly cost reports on operations under the contracts had been submitted to the Government. Should the parties be unable to agree the contract contemplated unilateral determination by the head of the agency. The amount for each hour of payable hours of direct labor is called the billing rate.

Article 5 also allowed plaintiff payment for the cost of its materials utilized directly on the work and for certain tools and facilities rented or furnished to the contractor in connection with the work. It authorized compensation for the cost of increased wages and related expenses resulting from retroactive mandatory orders of the War Labor Board. Under section (b) of Article 5 either party could request renegotiation of the price billed for work during a particular quarter or on an individual vessel under the contract, and, in the event the parties could not reach an understanding, the agency was to decide the question unilaterally.

The facts show that while the supplemental agreements as to the billing rate resulted from bargaining, the parties gave great consideration to plaintiff's actual cost factors in determining this amount. Finding 5 indicates the accounting procedures that were followed in formulating the applicable rates. The usual practice was to compute a rate on the basis of quarterly reports of costs incurred by the plaintiff in the execution of the contracts. This rate was then used in computing compensation to be paid for the quarter commencing one

month after the end of the quarter for which cost computation had been made. As the plaintiff has pointed out, this method of payment had the effect of giving compensation for one period on the basis of costs from another, earlier period.

During the time the contractor was carrying out its master ship repair contracts, it carried workmen's compensation insurance with the Industrial Indemnity Exchange. Plaintiff's policies were participating policies under which it would be entitled to certain dividends from the surplus accruing to the carrier when the carrier's receipts exceeded its losses. The carrier divided this fund among the firms it insured according to a formula which favored those participants with the best safety record. While plaintiff's safety record during the first two years of its policies was such that it received no dividends, during 1944 and 1945 plaintiff's safety record greatly improved and it was paid large dividends for those periods.

Plaintiff did not receive the first of these dividend payments until near the end of its contracts with the Government, the other dividends not until long after the completion of the contracts. Since the contracts provided for substantially current payment, whatever costs for workmen's compensation insurance had been considered in fixing plaintiff's compensation did not take into account the dividends which plaintiff later received on its policies. The evidence does not allow any determination as to whether plaintiff recovered from the Government all workmen's compensation insurance costs that were properly allocable to the ship repair contracts. Nevertheless, it permits the inference that the cost factors that were considered in negotiating the billing rate included certain amounts for workmen's compensation insurance. The parties have agreed that one hundred and seven-one hundredths of $109,128.70 is the amount of the insurance dividends properly allocable to the three master ship repair contracts.

Defendant bases its right to recover on the following sentence in section (e) of Article 5 of the contract:

"If the Contractor, after having been reimbursed, either directly or indirectly, by the Government for any item of services, material or overhead, subsequently receives any additional sum as a discount, rebate, allowance, credit, salvage or commission in respect of any such item, the Contractor shall promptly pay to the Government an amount equal to eleven-tenths (11/10) of such additional sum."

Plaintiff contends that it does not fall within the strictures of this clause: first, because it was not "reimbursed" by the Government; and second, because a dividend on a workmen's compensation insurance policy is not an additional sum received as a "discount, rebate, allowance, credit, salvage or commission in respect of any" item of "services, material or overhead".

■ Before its argument on the merits, plaintiff raises several procedural objections addressed to defects in the pleadings. The Government pleaded in its counterclaim that "plaintiff is further obligated to pay to defendant under the provisions of Article 5(e) of the contract, a copy of which is attached hereto as Exhibit 'D,' the sum of $112,472.93 representing sums received by the plaintiff from its insurance companies as reimbursement on premiums paid by plaintiff for Workmen's Compensation insurance on employees working under the contract". An earlier paragraph of defendant's pleading had made reference to "both Navy Department Contract No. NOBS–10185 and War Shipping Administration Contract No. WSA–6045, hereinafter referred to as 'the contracts' ", but did not refer to the third contract. Plaintiff first argues that the Government has not pleaded its rights under the third contract, the War Department contract, and is, therefore, precluded from recovering that much of its

claim under the pleadings. Defendant's counterclaim does not allege a claim under the War Department contract nor does it allege that defendant is entitled to any of the workmen's compensation insurance dividends allocable to that contract. We think that defendant has not pleaded a counterclaim to the War Department contract. It is precluded from recovering on its counterclaim to that extent. Standard-Vacuum Oil Co. v. United States, 339 U.S. 157, 70 S.Ct. 545, 94 L.Ed. 731; Werfel v. United States, D.C., 83 F.Supp. 507; Lilly v. United States Lines Co., D.C., 42 F.Supp. 214.

■ Defendant pleaded in its counterclaim that plaintiff was obligated to repay "under the provisions of Article 5 (e) of the contracts, a copy of which is attached hereto as Exhibit 'D' ". Plaintiff's second procedural argument relies on the fact that Exhibit D does not contain the last sentence of Article 5(e), which is the sentence quoted two paragraphs above and the very sentence upon which defendant predicates its right to recover. That sentence came into the contract by amendment to the contract to which plaintiff agreed.

The plaintiff asserts that the Government's pleadings are incomplete, but we think they are sufficient to cover the Government's theory of recovery, and that plaintiff has not been surprised or prejudiced. There is no contradiction between the exhibit and the pleadings. Exhibit D was identified in the counterclaim as Article 5(e) of the contract, but stars indicated that the section was not quoted in full. The question raised is not whether the defendant relied on Article 5(e) or what were the terms of Article 5(e), but what parts of it defendant was relying on. As to the latter question plaintiff could not have been misled. As early as 1947 plaintiff had written to defendant in regard to the controversy in suit here.

Plaintiff there quoted the disputed part of Article 5(e). It said that it understood the Government was relying on it. Plaintiff maintained that the quoted sentence did not warrant the Government's claim. Under the circumstances plaintiff had no right to construe the pleadings as narrowly as it did and it cannot now, at this late stage of the proceedings, make a justifiable claim of having been misled as to the true nature of the Government's claim.

■ On the first part of plaintiff's argument on the merits, we think that plaintiff has been "reimbursed either directly or indirectly", within the meaning of the contract. Plaintiff contends that to reimburse means to repay an equivalent, citing Webster's definition.[1] It argues that section (e) applies only to savings in the cost of direct materials or other items for which plaintiff was compensated directly. It says that it never was given an equivalent to what it expended on the insurance premiums; that these premiums were merely considered in fixing the billing rate and there is no proof that they were, in fact, recovered in the compensation received from the Government. It is also contended, in the alternative, that had the accounting system used in connection with negotiating the billing rate been one of cost reimbursement, the contract would have been an illegal cost plus a percentage of cost contract since that accounting system also included a profit factor based on a percentage of costs.

Even though the Government was under no obligation to repay all of plaintiff's costs plus a percentage for profit, the compensation that plaintiff did receive was closely correlated to its costs. Plaintiff had made an offer of proof to show that not all its costs had been considered in fixing the billing rate and that consequently it had not been fully reim-

---

1. Webster's New International Dictionary of the English Language (Second Edition) defines the word "reimburse" as follows on page 2100:
  1. Literally, to replace in a purse (an equivalent for that taken, lost, or expended); hence, to pay back; repay; *Obs.*, to refund; as, to *reimburse* the expenses of a war. 2. To make restoration or payment of equivalent to (a person); to indemnify; as, to *reimburse* one for his losses. ·

bursed. This is beside the mark in connection with the application of Article 5(e) since, as plaintiff points out, the billing rate did not contemplate a literal, dollar-for-dollar reimbursement of all of plaintiff's costs. It is sufficient that we know that the premiums had been considered in fixing plaintiff's compensation. Thereupon the contract under section (e) of Article 5 gives us a formula for adjustment. This formula provides for the return by plaintiff of one hundred and seven-one hundredths of any reductions allocable to the ship repair contracts which plaintiff may receive after having been compensated.

The first part of section (e) required the plaintiff to take cash and trade discounts, etc. We do not think it probable that the contract intended plaintiff to make these savings only in those cost items for which plaintiff was to receive direct compensation but not in those items which were merely considered in arriving at a billing rate. Since we cannot agree with plaintiff's narrow construction of the first part of section (e), we must also disagree with its conclusion that the last clause of section (e) must be given the same narrow range of effect. The all-embracing character of the duty to minimize costs under Article 5 (e) is illustrated by the language of that part of the contract. The first sentence of section (e) speaks of "all cash and trade discounts, * * *"; the second sentence says "materials and services of every kind required for the performance of this contract". This conclusion receives further support in the last sentence where it speaks of "any item of services, material or overhead".

Section (e) as originally written stipulated that the contractor should take advantage of all cash or trade discounts, etc., and that it would be charged as though it had taken advantage of them if it culpably failed to do so. The added portion of section (e) requires that plaintiff should pay one hundred and seven-one hundredths of any sum it receives as a discount, etc., on any item for which it has been reimbursed by the Government.

Plaintiff's second main argument maintains that when it received the dividends on its workmen's compensation insurance policies it did not receive an additional sum as a discount, rebate, allowance, credit, salvage, or commission. Plaintiff thinks that fixed or presently obtainable discounts, etc., were intended by these words; that such discounts, etc., are conditioned on wholly formal and ministerial requirements, whereas the insurance dividends depended on an uncertain event in the future, namely, plaintiff's safety record. As such, plaintiff contends, the dividends were payments in the nature of a reward for plaintiff's managerial skill in reducing accidents.

The terms discount, rebate, allowance, credit, salvage, or commission clearly cover the refund on insurance premiums. These words suggest a general concept, such as any subsequent reduction in a cost item. This broader category would include payments of dividends of the kind here received by the plaintiff.

Plaintiff is entitled to recover the stipulated amount of $34,683.37. On the controverted counterclaim defendant is entitled to recover $89,542.22. This represents $109,128.70 minus one hundred and seven-one hundredths of the amount allocable to the War Department contract—that is, minus $19,586.48. Defendant is, therefore, entitled to recover the net amount of $54,858.85, with interest at the rate of 4 percent per annum from the date of the filing of defendant's counterclaim, to wit, March 7, 1952, to date of payment.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.